IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLIONIS, EASTERN DIVISION

| | |
|---|---|
| In Re: | ) |
| | ) |
| DANIEL FRYZA and KATHERINE REVELAS, | ) |
| | ) NO. 14 B 44618 |
| | ) |
| Debtors | ) |
| | ) Chapter 13 |
| | ) |
| | ) Honorable Judge Daniel R. Cassling |

### DEBTORS' RESONSE TO PNC BANK, NATIONAL ASSOCIATION'S OBJECTION TO CONFIRMATION OF THE DEBTOR'S CHAPTER 13 PLAN

Now Comes, DANIEL FRYZA and KATHERINE REVELAS (hereinafter called "Debtors") by their attorneys, Penelope N. Bach and Paul M. Bach of Sulaiman Law Group, Ltd., and Respond to PNC Bank, National Association's (Hereinafter "Bank") Objection to Confirmation filed on January 27, 2015 and states as follows:

In its objection, Bank basically makes two arguments in its attempt to persuade this Court into believing that the Chapter 13 Plan filed by Debtor on January 8, 2015 should not be confirmed. These Objections to Confirmation are: 1) The Debtors' Chapter 13 Plan, dated January 8, 2015, is legally not confirmable because the Debtors are attempting to "Cram Down" a second mortgage on the Debtors' principal residence located at 1236 Teasel Lane, Naperville, Illinois ("the real estate") in alleged violation of 11 USC 1322(b)(2); 2) The Debtor's valuation of the real estate of $260,000.00 contained in the Chapter 13 Plan (Section G) is not valued correctly. Debtors will respond to each of the two Objections below.

1

## THE CHAPTER 13 PLAN DATED JANUARY 8, 2015 AS CRAMDOWN IS ALLOWED BASED 11 USC 1322 (C)(2) (BANK'S FIRST OBJECTION)

The Debtors' reside in and own the real estate. The fair market value of the real estate at the time of the filing of the Chapter 13 case was $260,000.00. Additionally, at the time of the filing of the Chapter 13 case, the real estate was subject to two mortgages. Both mortgages are held by the Bank, The first mortgage is in arrears and the Debtor believes that the amount owed on the first mortgage is $231,023.81 with arrears (which is not taken into account in the Objection). Consequently, $28,976.19 of the second mortgage is a secured claim and the balance an unsecured claim.

The Debtors have a Chapter 13 Plan which "crams down" the mortgage based on the fair market value at the time of filing. This treatment is allowed by 11 USC 1322(c)(2) as the second mortgage has already matured and all of the requirements of 11 USC 1325(a)(5) are met.

Paragraph Two of Section G of the Chapter 13 Plan states as follows:

Pursuant to 1322(c)(2) Debtors will pay off the secured second mortgage of PNC Bank at the full fair market value of $48,976.19 including interest of 2.0%, that the second mortgage of PNC Bank shall be bifurcated into secured and unsecured status and that the remaining unsecured portion of the first mortgage shall be classified and paid as a general unsecured creditor. Upon entry of discharge in this Chapter 13 case, PNC Bank its successors and assigns shall release its security interest and/or Mortgage in the property commonly known as 1236 Teasel, Naperville, IL

**Section 1322(c)(2) states in relevant part:**

(c) Notwithstanding subsection (b)(2) and applicable nonbankruptcy law.....

*(2) in a case in which the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final*

2

> *payment under the plan is due, the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title*

**Section 1325(a)(5) states in relevant part:**

> *(5) with respect to each allowed secured claim provided for by the plan—*
> *(A) the holder of such claim has accepted the plan;*
> *(B)(i) the plan provides that—*
> *(I) the holder of such claim retain the lien securing such claim until the earlier of—*
> *(aa) the payment of the underlying debt determined under nonbankruptcy law; or*
> *(bb) discharge under section 1328; and*
> *(II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law; . . . or*

This particular section of the Bankruptcy Code is one that has taken on a change every time the Bankruptcy code is revised. Prior to 1994, there was a clear prohibition against using 11 USC 1325(a)(5) to satisfy an entire mortgage. *See, e.g.* First Nat'l Fid Corp v. Perry, 945 F.2d 61 (3rd Cir. 1991). The Bankruptcy Reform Act of 1994 intended to overrule Perry by granting Debtors in 11 USC 1322(c)(2) the power to modify certain types of mortgages through application of 11 USC 1325(a)(5). *See,* In Re Escue, 184 B.R. 287, 293 (Bankr. M.D.TN. 1995). Which brings us to the current day interpretations and the case at bar.

The Bank seems to make statements that the Courts are split in whether 11 USC 1322(c)(2) can be used by the Debtors in this way. This is not the truth. This issue has been directly ruled upon by two Federal Circuit Courts: the 4th and the 11th. The 4th ruled In Re Witt, 113 F.3d 508 (4th Cir. 1997). That opinion has been followed only (with only a few exceptions) in those Bankruptcy Courts in the 4th Circuit. The majority

3

of Courts (including the few Judges in this this District who have considered this issue) follow In Re Pachen, 296 F.3d 1203, 11 Cir. 2002).

    The Court in Pachen stated at 1207:

In construing a statute we must begin, and often should end as well, with the language of the statute itself." *United States v. Steele,* 147 F.3d 1316, 1318 (11th Cir.1998) (en banc) (internal quotation marks omitted). When the language of a statute is unambiguous, we need go no further, because we must presume that Congress "said what it meant and meant what it said." *Id.* "The plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *Ron Pair Enters., Inc.,* 489 U.S. at 242, 109 S.Ct. 1026 (alteration in original) (internal quotation marks omitted). The import of these authorities is that we need not resort to extrinsic evidence, such as legislative history, to discern a statute's meaning if the statute's language is unambiguous.

    In the instant case, the plain language of the statute indicates a clear congressional intent to except certain short-term mortgages from the general rule prohibiting the modification of claims secured only by an interest in a debtor's primary residence in a Chapter 13 proceeding. Debtors' interpretation of the statute is the correct one. An assessment of the text of § 1322(c)(2) reflects its clarity.

    The prefatory phrase "[n]otwithstanding subsection (b)(2)" is the first important indicator of congressional intent with respect to this statute. The phrase is a plain statement that subsection (b)(2)'s prohibition on the modification of loans secured only by an interest in a debtor's primary residence does not have any application to the class of claims that fall under § 1322(c)(2). This interpretation of the "[n]otwithstanding" phrase has been noted by a number of other courts charged with construing § 1322(c)(2). *See, e.g., In re Eubanks,* 219 B.R. at 470 ("The introductory phrase, `[n]otwithstanding subsection (b)(2)' clearly signals the drafter's intention that the provisions of the `notwithstanding' section override conflicting provisions of any other section") (alteration in original) (internal quotation marks omitted); *In re Bagne,* 219 B.R. 272, 277 (Bankr.E.D.Cal.1998) ("Plainly, this [prefatory] language instructs the court to disregard § 1322(b)(2)."); *In re Mattson,* 210 B.R. 157, 160 (Bankr.D.Minn.1997) (holding that the prefatory phrase meant that "[w]e are therefore to ignore subsection (b)(2), at least to the extent that it is inconsistent with the language that follows").

    In addition, the reference to § 1325(a)(5) is highly relevant to our understanding of § 1322(c)(2). As we noted earlier, § 1325(a)(5) permits writing down secured claims to the value of the collateral securing the debt. *See United States v. Arnold,* 878 F.2d 925, 928 (6th Cir.1989) ("Under [§ 1325(a)(5)], the debtor can `cramdown' a plan repaying only the `allowed secured claim'...."); *In re Young,* 199 B.R. at 647 ("The very essence of a § 1325(a)(5) modification is the write down or `cramdown' of a secured claim to the value of the collateral securing the debt."). The phrase "payment of the claim as modified pursuant to section 1325(a)(5)" is an explicit statement of § 1322(c)(2)'s purpose: claims that fall within its ambit are subject to bifurcation into secured and unsecured parts, with the unsecured portion subject to "cramdown" pursuant to § 1325(a)(5). *In re Eubanks,* 219 B.R. at 471-72. And the claims that fall under § 1322(c)(2) are those in which "the

4

last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due before the date on which the final payment under the plan is due" — precisely the kind of claim at issue in this case.

The Paschen Court continues and states on page 1208 and 1209 **calls the Witt courts grammatically strained**:

In *In re Witt*, the Fourth Circuit found § 1322(c)(2)'s critical phrase "payment of the claim as modified" ambiguous, because "[i]t [could not] be determined, merely from the statute's text, whether the words 'as modified' should apply to 'payment' or to 'claim.'" *Id.* at 511. If the term "as modified" modifies "payment," the *Witt* court found that a mortgage covered by § 1322(c)(2) could not be bifurcated and crammed down — rather, § 1322(c)(2) merely could provide for the modification of the schedule of payments made on such a claim. *Id.* The Fourth Circuit held that it was in fact a plausible reading of the statute to assume that the phrase "as modified" modifies "payment," rather than "claim." *Id.* The court stated that because the subject of "payment" was the focus of § 1322(c)(2), it is likely, "as a matter of common sense," that the modifier "as modified" was a reference to the central subject of the statute. *Id.* The court further noted that the phrase "payment" would be superfluous if the contrary reading of the statute were accepted; the court reasoned that if Congress had intended the phrase "as modified" to refer to "claim," there would have been no reason to include the term "payment" in the statute. *Id.* at 512. Congress simply could have stated that "the plan may provide for the claim to be modified" if this were its intended reading. *Id.* (internal quotation marks omitted).

After finding this alternative construction of § 1322(c)(2) one, though not necessarily the only, plausible reading of congressional intent, the *Witt* court assessed the statute's legislative history in an effort to gauge Congress's intent in the face of an ambiguous statute. The Fourth Circuit's reading of that history led the court to conclude that § 1322(c)(2) does not provide for the bifurcation and "cramdown" of undersecured, short-term home mortgages.[3] *Id.* at 513-14. AGF urges us to adopt the Fourth Circuit's analysis in construing § 1322(c)(2).

**We are not convinced by our sister circuit's reasoning. The *Witt* court's view that the phrase "as modified" modifies "payment," rather than "claim," is a grammatically strained reading of the statute. It contradicts the rule of the last antecedent,[4] an accepted canon of statutory construction which provides that when construing statutes, "qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to and including others more remote."** *United States v. Correa*, 750 F.2d 1475, 1481 n. 10 (11th Cir.1985) (internal quotation marks omitted). **Amicus Curiae points out that had Congress intended for the phrase "as modified" to modify "payment," it could have done so by placing the modifier next to the phrase to be modified, such as through "payments as modified on the claim," or "modified payments on the claim."** *Br. of Amicus Curiae Nat'l Ass'n of Consumer Bankr. Att'ys in support of Debtors-Appellees* at 13.

Additionally, the *Witt* court advances no convincing explanation for the meaning of the reference to § 1325(a)(5) in the text of § 1322(c)(2). As we have noted, § 1325(a)(5)

5

is the provision that permits the bifurcation of undersecured claims into secured and unsecured components, with the unsecured component subject to "cramdown." "Payments" cannot be modified pursuant to § 1325(a)(5); only *claims* are subject to § 1325(a)(5)'s modification provisions. **The reference to § 1325(a)(5) could not be a plainer statement of the statute's purpose; it is an exception to the general rule preventing the modification of claims secured by home mortgages.** See *In re Mattson*, 210 B.R. at 160 ("[I]n certain limited circumstances which obtain [in § 1322(c)(2)], the debtor may in fact utilize the provisions of § 1325(a)(5) to cram down on the secured creditor....").

We note that the great weight of persuasive authority supports debtors' interpretation of § 1322(c)(2); *In re Witt* **appears to be the only case interpreting the statute differently.** See, e.g., *In re Eubanks*, 219 B.R. at 472; *In re Sexton*, 230 B.R. 346, 349 (Bankr.E.D.Tenn.1999); *In re Reeves*, 221 B.R. 756, 759 (Bankr.C.D.Ill.1998); *In re Mattson*, 210 B.R. at 160; see also Collier on Bankruptcy § 1322.16, at 1322-51 (Lawrence P. King et al. eds., rev. 15th ed.2001). Indeed, we have noted in dicta that § 1322(c)(2) was intended "to except short-term and balloon mortgages from [§ 1322(b)(2)'s] reach, thereby overruling *Nobelman* insofar as it applied to [those] types of mortgages." *In re Tanner*, 217 F.3d 1357, 1358 n. 5 (11th Cir.2000). **The plain language of § 1322(c)(2) compels us to agree with the consensus of those courts that have considered the provision; § 1322(c)(2) permits the modification of claims (through bifurcation and "cramdown") secured by those short-term home mortgages that mature prior to the completion of a debtor's Chapter 13 plan.**

1325(a)(5) determines the value as of the effective date of the Plan.. Using this appraisal, the Court must also look to Section 506 of the Bankruptcy Code. In this section, the Code can determine the secured value of the claim. Specifically Section 506(a) allows for the bifurcation of a claim into secured and unsecured components. *See, In Re Reeves, 221 B.R. 756, 757 (Bankr. C.D. IL 1998).*

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest ... and unsecured claim to the extent that the value of such creditor's interest ... is less than the amount of such allowed claims. 11 USC 506(a)(1).

Additional support for the holding in Paschen can be found in In Re Young, 199 B.R. 643 (Bankr. E.D. Tenn 1996) which found that there is no statutory basis for treating undersecured home mortgages which fall due before the end of the plan differently from any other undersecured creditor now that the protection for these types of debts have been

6

eliminated by 1322(c)(2). Also, In Re Mattson, 210 B.R. 157 (Bankr.D.Minn 1997), rejected Witt holding that the "opinion is flawed". The correct result is reached by a straight forward reading of the statute. Mattson at 158-159.

More recently, *In Re Isaac, 2005 WL 3939840* (Bkrtcy N.D.ILL.) Judge Jacqueline P. Cox stated that "the general anti-modificaion rule does not apply to the first mortgage on a debtor's primary residence since the debt was a short term obligation. Judge Cox uses the plain meaning approach which is the popular interpretation of 1322(c)(2) and would have allowed for bifurcation the first mortgage. See also the Docket of a case decided by Judge A. Benjamin Goldgar (10-37957) in which a Chapter 13 Plan substantially similar to this case was confirmed over the Objection of the First Mortgage holder. Finally, attached is a transcript of a decision by Judge Barbosa in *In Re Alcala* 11 B 28873.

Here, the debtors can modify the Banks mortgage pursuant to 1322(c)(2) and 1325(a)(5) and the First Objection to Confirmation should be overruled. The vast caselaw above is clear. Debtors can modify their mortgage into secured and unsecured in this case. Debtors merely seek to use the plain language set forth in 1322(c)(2) just as they would with any other secured creditor in their Chapter 13 Plan.

### THE COURT WILL NEED TO HOLD A VALUATION HEARING TO DETERMINE THE FAIR MARKET VALUE

The Bank has attached was the Bank calls a "recent valuation" to its Objection. However, the valuation attached is anything but recent being dated March 27, 2014. Additionally, this is not an appraisal and certain information is deleted including the person who performed the valuation. What the "recent valuation" is questionable and worthless. Additionally, the condition of the property is not taken into account.

WHEREFORE, Debtors, DANIEL FRYZA and KATHERIN REVELAS, prays that

7

this Court overrule the Objection to Confirmation filed by PNC BANK, National Association as to the Chapter 13 Plan filed on January 8, 2015 and confirm the Chapter 13 Plan filed on Janaury 8, 2015 and for any other relief as this Court deems just.

>Respectively Submitted,
>DANIEL FRYZA and KATHERIN REVELAS
>
>By: /s/ Paul M. Bach

Paul M. Bach
Penelope N. Bach
SULAIMAN LAW GROUP, LTD.
900 Jorie Blvd. #150
Oak Brook, Illinois 60523
630 575 8181